G. SCOTT SOBEL, Esq., SBN 124818
LAW OFFICE OF G. SCOTT SOBEL
1136 S. Shenandoah Street, Suite 101
Los Angeles, CA 90035-2268
Tel: 323-377-4000 / Fax:  888-863-5630
GScottSobel@gmail.com
Attorney for Rovier Carrington

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ROVIER CARRINGTON,<br><br>　　　Plaintiff,<br><br>　　　vs.<br><br>NATIONAL AMUSEMENTS, INC.,<br>PARAMOUNT GLOBAL,<br>PARAMOUNT PICTURES<br>CORPORATION, GOOGLE,<br>GODADDY, VARIETY, THE<br>HOLLYWOOD REPORTER & THE<br>HONORABLE KATHERINE POLK<br>FAILLA,<br><br>　　　Defendants. | CASE NO:<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES DUE TO VIOLATIONS OF PLAINTIFF'S RIGHT TO REDRESS GRIEVANCES TO THE GOVERNMENT, DUE PROCESS RIGHTS, VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, DEFAMATION PER SE, NEGLIGENCE & DURESS AS A DEFENSE TO FORMATION OF CONTRACT REGARDING A PLEA**<br><br>**JURY TRIAL DEMANDED** |

### I.　　The Parties to This Complaint

1. Plaintiff, ROVIER CARRINGTON, is a resident of Los Angeles, California.

2. Defendant NATIONAL AMUSEMENTS, INC. is a privately owned theater

company and mass media holding company based in Norwood, Massachusetts, and incorporated in Maryland while operating and conducting business in Los Angeles, California. Defendant PARAMOUNT GLOBAL is an American corporation, formed through the merger of CBS Corporation and the second incarnation of Viacom. Paramount Global is headquartered in Manhattan, New York, NY while operating and conducting business in Los Angeles, California and throughout the world. Paramount Global owns and operates among other properties, MTV Networks, Comedy Central, Logo Network, and their main asset, PARAMOUNT PICTURES CORPORATION, a film studio, with its headquarters in Los Angeles, California.

3.  Defendant PARAMOUNT PICTURES CORPORATION, ("PARAMOUNT" or "PARAMOUNT PICTURES") is an American film studio and a subsidiary of Paramount Global.

4.  Defendant GOOGLE LLC is an American multinational technology company, with its headquarters in Mountain View, California.

5.  Defendant GODADDY, Inc. is an American publicly traded internet domain registration and hosting company, headquartered in Tempe, AZ.

6.  Defendant HON. KATHERINE POLK FAILLA is a United States District Court Judge in the Southern District of New York. Judge Failla is sued in her individual and official capacity, for violations of the ADA, for violations from the United States Constitution.

## II.    **Basis for Jurisdiction**

7.  Plaintiff asserts original federal subject matter jurisdiction under 42 U.S.C. § 1983 et. seq. (the Civil Rights Act), 28 U.S.C. § 2201 et. seq. (the Declaratory Judgment Act), 42 U.S.C. §§ 12101 (the Americans with Disabilities Amendments Act) et seq (2008), U.S. Const. amend. 1 (the Right to Redress Grievances), U.S. Const. amend. XIV, § 5 (the Due Process Clause), and U.S. Const. amend. XIV, § 1 (the Due Process Clause as Applied to the States). The claims that arise under the laws of the State of California, have supplemental jurisdiction to the above federal subject matter jurisdiction claims, as they arise from the same transaction and set of occurrences.

### Statement of Claim

## III.    **First Amendment Right to Redress our Government for Grievances**

8. The U.S. Const. amend. 1 (the Right to Redress Grievances) says that Congress may make no law that will prohibit citizens "to petition the Government for a redress of grievances." This basic freedom allows to seek redress for complaints without fear of reprisal. It has been expanded to include state governments, courts, and executive branches[1]. Communication, to be protected as a Petition for Redress, would have to contain no falsehoods nor rise to the level of frivolity. The right to petition includes under its umbrella the

---

[1] Congressional Research Service. *"U. S. Constitution Annotated: Amendment I, Rights of Assembly and Petition"*. Legal Information Institute. Cornell Law School. Retrieved May 1, 2023.

legal right to sue the government.[2]

9.   Plaintiff Carrington filed a complaint in The United States District Court, Southern District of New York, Case No. 18-CV-04609-KPF, in *Carrington v. Graden et al.* ("New York Suit") where he sought relief from sexual assaults against Brad Grey, Brian Graden and Paramount Pictures, which commenced when Carrington was a minor. As proof, Carrington's attorneys submitted emails as evidence in the amended complaint without Carrington's consent. Attached as Exhitit 1 is a true and correct copy of a text message between Carrington and his counsel evidencing that Carrington never saw the amended complaint before it was filed. The emails were verified as authentic by an independent neutral third-party named FTI, who was hired by the defendants. Despite such, Carrington has been accused of perjury for falsifying emails and for signing a false affidavit, to which, Carrington has evidence showing his former attorneys filed the amended complaint, the emails, and an altered affidavit without notifying him, causing Carrington to fire his counsel and request a dismissal without prejudice, which was denied, causing Carrington to request a venue change in the New York case.

10.   There is currently a protective order, stemming from the above New York Suit, that bars Plaintiff Carrington's grievances, which he was never able to

---

[2] Newton, Adam. "*Petition - Right to sue*". First Amendment Center. Archived from the original on March 24, 2011.

fully litigate in a fair and neutral court with his Due Process and other rights being afforded. After the New York Suit was dismissed with prejudice due to the defendants and their attorney's committing fraud, Plaintiff Carrington filed a suit in the Central District of California (the California Suit). During the California suit, Defendant Judge Failla and Paramount Pictures pressured Carrington into withdrawing the suit with prejudice. The cumulation of said event, in turn, clearly violated Plaintiff Carrington's Right to Redress under the First Amendment.

11.   It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. *Giboney v. Empire Storage Co.*, 336 U. S. 490 (1949). Yet, Plaintiff Carrington only attempted to bring claims for true grievances and asked for meaningful access to the courts as protected by Due Process, to do such. He continues to assert the veracity of such emails his attorneys provided as evidence and denies that he falsified or otherwise altered them in any manner. Moreover, as shown in the video, which shall be submitted as evidence, Plaintiff Carrington was under duress when he entered into the plea for the related perjury charge.

IV.   **Fifth and Fourteenth Right to Due Process of Law**

12.   The Fifth Amendment to the United States Constitution provides in part that "no person shall be… deprived of life, liberty, or property, without due

process of law…." U.S. Const. art. I, § 8, cl. 5.  This is applied to the States through the Fourteenth Amendment. U.S. Const. art. XIV. This clause promises that before depriving a person of a property interest that person is given notice of the actions, and an opportunity to be heard. As a threshold issue, these interests may only be enforced from deprivation by a state actor. Additionally, as shown in detail below, the Americans with Disabilities Act and further the Amendment Act, strengthen the spirit of the Due Process clause by calling for such access to be meaningful.

13.  Plaintiff Carrington contends that he was not afforded a chance to bring forth evidence for his claims in the New York Suit, as the independent third-party verifications were not taken as truthful. Despite this evidence, including multiple witnesses who provided declarations to the court, Plaintiff Carrington was still denied Due Process to bring forth his claims and seek redress. This is the property right that is being deprived for Plaintiff.

14.  Due Process requires that the procedures by which laws are applied must be evenhanded, so that individuals are not subjected to the arbitrary exercise of government power.  This right is a "basic aspect of the duty of government to follow a fair process of decision making when it acts to deprive a person of his possessions.   The purpose of this requirement is not only to ensure abstract fair play to the individual.   Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment…."

Thus, the notice of hearing and the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *See Armstrong v. Manzo*, 380 U.S. 545, 552, (1965); *Tumey v. Ohio*, 273 U.S. 510 (1927); *and In re Murchison*, 349 U.S. 133 (1982).

15.  Plaintiff Carrington was not afforded Due Process due to errors in the New York Suit, that took place ultimately led to him being accused of falsifying evidence despite independent verification. On February 7, 2019, Judge Failla, sitting over the New York Suit, agreed to dismiss the case without prejudice if Plaintiff was cleared of falsifying the emails in question, so that he could re-file his lawsuit in Los Angeles. Plaintiff Carrington agreed to dismiss his request for change of venue in exchange for allowing FTI to mirror image his iPhone and receive his email data from Google, GoDaddy and Office365, for at-issue-communications only. Judge Failla agreed that once this process was completed, if Plaintiff Carrington did not falsify emails, she would dismiss the case without prejudice, but if it was found that he did alter or delete email content, Judge Failla would grant sanctions. On February 13, 2019, a subpoena was issued to submit the information to the neutral third-party forensic expert, FTI.

16.  Yet, amid this one-sided investigation, Google and GoDaddy released raw data reports to the Defendants attorney, Larry Stein rather than FTI, despite the subpoena order strictly stating provide the data to FTI. Google did submit

1/2 of Carrington's data reports to FTI, only after Carrington exchanged several emails with Google's legal department, who stated they were giving his data to Larry Stein rather than FTI. FTI eventually cleared 3/3 of Plaintiff Carrington's data reports of no wrongdoing after Carrington provided FTI the data illegally collected by Larry Stein, who provided the data to Variety and The Hollywood Reporter, in order for both publications to publish the sensitive data and claim a forensic expert discovered Carrington faked emails to back false rape accusations. The Defendants sought sanctions and, in their brief, filed their own falsified conclusions of the raw data to prevent Carrington from dismissing the New York case without prejudice as promised by Judge Failla. This is the crux of the issue, which caused Plaintiff Carrington to have perjury charges filed against him, as he named Judge Failla as a Defendant in the California Lawsuit. Carrington wishes to prove that he has not committed any falsehoods and be permitted to seek justice for his original claims.

17.  Moreover, on September 11, 2020, almost a year after the original case ended, Judge Failla filed a permanent injunction against Plaintiff Carrington in the New York Suit, which barred him from further attempting to bring his claims. The injunction was granted after Judge Failla and the defendants learned they would be sued in Los Angeles federal court for the fraud committed in the New York case.

18. All parties were sued regardless as the permanent injunction was only granted by Judge Failla to prevent Carrington from exposing her bias conduct and fraud, consisting of her deleting the defendants' falsified documents from the docket within the same hour Carrington filed the authentic review of his raw data. Carrington's documents also exposed the defendants of disobeying the subpoena order and using their relationships with Variety and The Hollywood Reporter to defame him.

19. Judge Failla willingly violated federal procedure throughout the New York case, in order to protect the defendants, allowing Brian Graden to continue sexually abusing male minors of color.

20. Once the suit was filed in Los Angeles, Judge Failla and her co-defendants, including Larry Stein, Carrington's former attorney and sexual abuser, made threats toward Carrington and his attorney via court orders and emails to dismiss the case with prejudice or be jailed and his attorney fined $500 per business day until the case was dismissed with prejudice.

21. Once Judge Failla helped herself and her co-defendants holding Carrington and his attorney in contempt for filing the California case, she set February 22, 2021 as the date for Carrington to self-surrender and for fines of $500 per business day to begin accruing against his attorney if they did not dismiss the California case with prejudice by that date.

22. During the contempt hearing, Carrington's attorney raised his health

problems, which prevented him from going outside his home during Covid 19. Judge Failla swiftly requested Carrington's health records, which she ultimately used against Carrington in order to get him to dismiss his case against her and her co-defendants, denying his request for in-home incarceration.

23.   Judge Failla ordered U.S. marshals to Carrington's home, and stated they could use necessary force to enter and arrest him, if he did not submit a dismissal with prejudice in the California case. Judge Failla's repeated threats caused Carrington to withdraw his California suit as his health would have turned fatal if contracted Covid 19. This is the crux of the case at hand, as Judge Failla was a named Defendant in this suit, and she ordered the permanent injunction, a year after dismissing the New York suit with prejudice (despite her prior agreement to dismiss without prejudice so that Plaintiff could refile), which was after she discounted FTI's independent investigation that showed his emails submitted as proof were not found to have been falsified. The cumulative effect of these events caused a deprivation of Plaintiff Carrington's rights as described above.

24.   In civil cases, a balancing test is used to see if Due Process was infringed upon, that evaluates the government's chosen procedure with respect to the private interest affected, the risk of erroneous deprivation of that interest under the chosen procedure, and the government interest at stake.   *See*

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  Plaintiff Carrington is now facing a deprivation of his liberty through perjury charges due to the actions of the above-captioned Defendants. This is a serious private right, which the government chose procedure infringed upon and is still a looming issue that must be rectified. The chosen procedure grossly outweighs Plaintiff Carrington's freedom.

25.  The Hollywood Reporter, Variety, and other publications stated Plaintiff pled guilty, as he faked emails that led to his arrest, however The Hollywood Reporter and Variety have known since becoming familiar with Carrington that his claims are authentic and here lies a Hollywood machine by the name of National Amusements, Inc., Paramount Global and Paramount Pictures, using their powerhouse attorneys and assets to obliterate a male victim who is courageous enough to reveal his sinister abuse, starting at the age of 17, inflicted by Sumner Redstone, Brian Graden, Brad Grey, Sumner Redstone, Harvey Weinstein and Larry Stein.

### V. <u>Referenced Sexual Abuse from Carrington's Los Angeles Suit - Showing background into why the Defendants would commit fraud to conceal Carrington's claims.</u>

26.  In the world of show business there are several executives who operate and control what is placed on the big and small screen until they are dethroned or deceased. These executives abuse power by forcing talent to comply with rules to gain remarkable success or become an entertainment

mogul. They include Sumner Redstone, Harvey Weinstein, Brad Grey, and Brian Graden. Rovier Carrington had the misfortune of involvement with all four moguls throughout a ten-year period while attempting to build his producing and screenwriting career.

27.  Mr. Carrington became a chess piece in Redstone's board game company, National Amusements, Inc. Through National Amusements, Redstone controlled Viacom CBS, Paramount Pictures, MTV, Paramount Network, Brad Grey, Brian Graden, Harvey Weinstein and all actors, producers, directors and executives under the National Amusements umbrella. Redstone also controlled Carrington with strings that came with consistent instructions and limited movement outside of his control. Utilizing his controls, Redstone compelled Carrington into situations that resulted in sexual violence committed by himself, Grey, Graden, Weinstein, and others, which were later covered up with threats, physical force, and lawyers not afraid to commit fraud and defamation to silence a victim.

28.  At the age of 16, Carrington formed a relationship with a variety of executives at Viacom (Paramount Global). Once Carrington, age 22, was introduced to Sumner Redstone, Redstone viewed Carrington as "boyfriend material" for his many executives to share for romance and creative ideas. Redstone was among the small number of Hollywood moguls who decide the next Hollywood Star. Redstone also chose the love interest for his executives.

Carrington was placed in the love interest category with potential to become a star due to his exotic appearance. Redstone, Weinstein, Grey and Graden continually told Carrington that his mixed features and skin tone afforded him the opportunity to make it in the entertainment business. They all demanded that Carrington never allow his skin tone to darken, as appearing "too black" would turn them off and end his career.

29.   Brian Graden is known for the weekly sex parties at his Hollywood Hills home, which, Brad Grey and Sumner Redstone attended regularly until their recent deaths. These parties provide teenage boys, celebrity men, alcohol, and drugs to be shared amongst many seasoned executives and employees under Viacom CBS, Paramount, MTV, VH1, Logo and other sister companies. The parties are usually filmed to blackmail certain executives and employees, as well as the celebrities in attendance, so that favors are owed and control is provided to Graden and the higher-up executives at Viacom CBS, (Paramount Global).

30.   Carrington was manipulated into sex parties hosted by Redstone, Weinstein, Grey and Graden for their entertainment and to own his freedom. In show business, people arrange compromising incidents, placing you at their mercy: Carrington was drugged, sexually abused, and recorded on film. He was told that if he were to disobey or become disloyal, the videos of his

sexual abuse would be released, ruining his image and opportunities in the business.

### Brian Graden in Summer 2006

31.  In late June or early July 2006, 17-year-old Rovier Carrington was recruited by several executives at Viacom CBS in Santa Monica, California, to film an episode of MTV's "Parental Control" & "Next." Carrington was introduced to Brian Graden, the President of Programming for MTV, VH1, CMT and later, LGBT channel, Logo. Graden asked Carrington his age, to which Carrington said 17. Graden told Carrington of his power at Viacom CBS, and invited Carrington to dinner at a restaurant to discuss opportunities with Viacom CBS. Carrington accepted Graden's offer, meeting him later that evening at his Hollywood Hills home.

32.  Carrington arrived with friend who watched Graden greet Carrington as he welcomed him into his home alone. Graden initially discussed business with Carrington in his living room, prior to moving to personal information, such as Carrington's romantic affairs. Carrington stated he had a long-term girlfriend, as Graden disappeared into the kitchen to pour Carrington a cocktail, which Carrington did not realize was drug infused. Once Graden returned, he boasted of his development role in the TV series "South Park." Graden insisted that Carrington drink his cocktail. Apprehensive, Carrington began to drink. Graden came closer to Carrington after two sips. Graden

asked if Carrington still wanted dinner, but before Carrington could respond, Graden suggested they stay in. Carrington said he felt ill, as his body temperature rose, and his head began spinning. Carrington attempted to stand, but he couldn't maintain his balance. Carrington expressed his terrible state, but Graden ignored him and began French kissing Carrington. Carrington's vision became blurred as he fell onto the couch. Graden picked up Carrington's immobilized body and carried him into an upstairs bedroom, placing him onto the bed. Graden removed his clothing, sliding into bed with Carrington. Carrington repeated his horrible state and protested, but Graden began removing Carrington's clothes while saying, "You need air after drinking too much." Carrington said, "Stop." Graden's predatory conduct increased, as he double slapped Carrington's face "for denouncing him." Carrington began going in and out of consciousness. Graden whispered into Carrington's ear, "Other boys your age obey orders." Graden shoved his unprotected penis into Carrington's rectum several times. Carrington begged Graden to stop, however Graden continued the sexual abuse. Carrington yet again went in and out of consciousness, which infuriated Graden. Graden began slapping and choking Carrington, yelling "Wake up." "Enjoy daddy's raw cock." Graden filmed every moment of Carrington's traumatic first sexual encounter. Graden ejaculated inside Carrington's rectum before allowing him freedom to move. Carrington managed to crawl into Graden's

master bathroom, as Graden lay naked on the bed. Carrington discovered he suffered massive blood loss and damage to his rectum, requiring weeks to heal. Once Carrington emerged from the bathroom, Graden smiled and said, "You did great." Graden grabbed Carrington's clothes and said, "You should leave." Graden told Carrington, "You'll be a star, if you keep quiet about our encounter." Graden kissed Carrington's forehead and said, "This better stay between us."

## October 2010 Paramount Pictures, Sumner Redstone

33. Rovier Carrington created, produced, and starred in "The Life of a Trendsetter," a reality show that Carrington uploaded to youtube.com on October 21, 2010, which caught the eye of Paramount's Executive Producer and Casting Director, Reno Logan. Logan called the same day of the uploading, requesting that Carrington appear at Paramount the following day (Oct 22) to discuss signing the show.

34. Tony DiSanto, MTV's President of Programming, also contacted Carrington about an offer to sign Trendsetter. Logan told Carrington that with his Executive Producer title at Paramount, he could be an asset to Carrington's career. Logan shared ideas for Carrington to improve "The Life of a Trendsetter," before moving forward with Tony DiSanto's offer. Logan desired an Executive Producer title on the show, in addition to Executive Producing Carrington's dark comedy "Inheritance," which Carrington was building while

on the reality show. Logan wanted Paramount to sign "Inheritance," which would have been a crossover and lucrative deal. Logan presented Carrington to other executives at Paramount because, according to Logan, Carrington was "alluring and appeared underage.

35. Logan utilized Carrington's appearance and projects to book meetings with Sumner Redstone, now deceased. Redstone loved the idea of owning Carrington's cutting-edge projects under Viacom CBS, which he felt would produce revenue in the millions for National Amusements, Inc.

36. Logan began sending Carrington to more executives, including Sumner Redstone, who called him "brilliant" and "adorable." Redstone reviewed Carrington's show content and demanded he get an office on the lot. On October 25, 2010, Redstone asked Carrington for a private meeting to discuss him "joining the family." Logan pushed Carrington to meet with Redstone, as he could elevate both of their careers and "green light" production on Carrington's shows. Logan didnt elaborate on what to expect but told Carrington to "obey Mr. Redstone."

### October 27, 2010, Sumner Redstone at Paramount

37. On or about October 27, 2010, Carrington was driven to Paramount by a personal town car sent by Redstone. Carrington's manager and a friend followed in a separate car. Carrington arrived at Paramount to meet Redstone for a one-on-one business meeting, which occurred within Redstone's town

car. Redstone's driver stood outside the car once Carrington entered the backseat with Redstone. Redstone inquired about Carrington's loyalty. Redstone said loyalty is rewarded with green lighting projects and if Carrington wanted to be rewarded, he should be in concurrence. Carrington told Redstone loyalty is fine, if Redstone didn't allow his executives to sexually assault him, such as Brian Graden raping him when he was a minor. Redstone stated that Graden was lucrative to him, he supports everything Graden does, and Carrington should too, if he were to "join the family."

38. Redstone asked: "Was Brian [Graden] your first?" and "How old were you?" Carrington said: "Yes. 17." Redstone said: "You still appear 17. Don't tell people otherwise." Redstone asked: "How good was the sex?" and "Did Brian leave a gift in you?" Carrington attempted to exit the car as he was uncomfortable, but the child lock prevented him. Redstone: "Not so fast." Redstone grabbed Carrington's face and said harshly: "Don't disrespect me." Redstone began to massage Carrington's thighs and undo his belt and jeans. Carrington asked Redstone not to touch him. Redstone slapped Carrington's mouth and said, "Relax." Redstone pulled Carrington's pants and briefs below his knees, grabbing Carrington's penis with his rough and cold hands. Carrington declined Redstone, but he continued massaging his penis and testicles. Redstone spat on Carrington penis several times. Redstone said Carrington had "A perfect Jewish dick." Redstone continued massaging

Carrington while demanding: Carrington would meet someone very important soon and he better obey all orders and remain loyal to him, or else. Once Redstone finished assaulting Carrington, he alerted his driver to unlock the door. Redstone smiled at Carrington and said, "Loyalty," as Carrington walked away fixing his pants. Carrington walked into the arms of his manager and a friend as they stood nearby.

### November 2010 Reno Logan

39. Carrington and a friend had a meeting with Logan inside his Paramount office to discuss Carrington's reality show. Logan requested Carrington audition for his upcoming film. Carrington was asked to pretend to be dead, as Logan pretended to shoot him with a gun. The next audition process involved Carrington flirting with Logan. Logan requested Carrington have a few shots of liquor to get 'more involved in the scene.' Carrington began drinking. Logan mentioned that Redstone was happy with Carrington. Logan began massaging his own penis while saying Carrington should cast Logan's son in his reality show, and possibly date him. Logan asked if Carrington was good at "sucking dick," and if he could handle his "long and thick dick," which he pulled through his jeans. Logan walked towards Carrington and hugged him from behind, rubbing his penis against Carrington's anus. Logan laughed off his assault, as Carrington pulled away. Logan demanded Carrington make him a lot of money with his projects, and insisted Carrington meet with Redstone

for instructions on how to please a known actor, who had arrived on the lot in a red Ferrari.

### November 23, 2010, Sumner Redstone MTV/Viacom Contract

40. On or about November 23, 2010, Sumner Redstone signed an entertainment contract with Carrington for Viacom to produce Carrington's "The Life of a Trendsetter" with MTV, on condition Carrington gave Redstone creative control of the cast and a percentage of Carrington's dark comedy "Inheritance." Redstone agreed to allow Carrington to film his reality show on the Paramount lot, but demanded that Carrington obey his "daily rules," and only work with producers Redstone approved.

### December 2010 Brad Grey (Deceased)

41. Carrington was introduced to Brad Grey (deceased), Chairman/CEO of Paramount Pictures, at Paramount by Sumner Redstone, who demanded Carrington obey Grey's demands. Grey said he loved fashionable people who commanded a room as Carrington did. Grey explained his current relationship with Cassandra was for appearances, as they were both gay. Grey became overly touchy with Carrington on the lot, despite Carrington's decline. Grey and Carrington had dinner at the Polo Lounge the same evening. Grey drove Carrington home and while sitting in front of his place, Grey began forcefully kissing Carrington. Carrington was highly uncomfortable, but decided to go along after Grey threatened to tell Redstone he wasn't willing to "play the

game." Grey told Carrington that he could make or break his career, depending on his "participation." Grey played Usher's music and pulled out a cigar. Grey demonstrated with his lips on the cigar what he wanted to do to Carrington. Grey pulled Carrington's jeans down. Grey kept repeating how good Carrington's "Jewish dick" tasted. Grey begged Carrington to climax in his mouth or else he wouldn't let him back on Paramount's lot. Carrington complied.

### December 2010 "The Fighter" Premiere Grauman's Theater

42. Carrington arrived with two friends. Carrington was introduced to Mark Wahlberg, who was always respectful, and assaulted by Redstone. Redstone asked Grey if Carrington was obeying? Grey relayed he was indeed. Carrington told Redstone; Grey forced oral sex. Redstone laughed and stated, "As he should." "You better learn to like it, if you want your projects greenlit." Redstone grabbed Carrington's anus, pulling him from behind and wrapping his blazer around Carrington. Redstone said he wanted to watch Grey "fuck" Carrington inside his home, and it should be arranged before Grey left for New York.

### January 13, 2011, Brad Grey Management and Development Contract

43. Brad Grey signed a management and development contract for Paramount Pictures with Carrington on or about January 13, 2011. Grey agreed to manage Carrington's career and appear with Carrington in his reality show "The Life

of a Trendsetter," as the executive producer of Carrington's dark comedy "Inheritance." The reality show would capture the casting, development, and filming of "Inheritance" at Paramount.

### January 16, 2011, Golden Globe Awards (Beverly Hilton)

44. Grey requested Carrington's attendance at the Golden Globes. Carrington arrived with his two friends and his manager. Grey introduced Carrington to Chairman and CEO of HBO, Richard Plepler and Cassandra Grey. Grey requested he and Carrington discuss business in a suite upstairs. Grey's conduct instantly became aggressive once inside the room. Grey held a cigar and bottle of tequila. There was no mention of business. Grey pushed Carrington onto the floor and held him down while pouring tequila down his throat. Grey pulled his pants and underwear down before pulling down Carrington's. Grey shoved his penis in Carrington's face, as he poured more tequila down his throat. Grey constantly repeated how good their "Jewish bodies felt on one another." Carrington yelled for Grey to stop, however, Grey demanded Carrington show him respect, if he wanted to continue at Paramount Pictures. Carrington yelled for his manager and friend to help him, as they were outside the room. Grey started hitting Carrington in the face and chest to shut him up. Grey turned Carrington onto his stomach and banged his head into the floor to weaken him, as he slid his unprotected penis inside Carrington's anus. Grey brutally raped Carrington for 10-15 minutes. Grey

placed Carrington onto the bed while he was immobilized and bloody. Grey placed Carrington's legs over his shoulders before ejaculating inside him. Grey told Carrington he loved him but needed him to remain silent about their growing relationship, as his public relationship to his fiancé, Cassandra, meant a lot for his image as a straight man.

### January 17, 2011, Reno Logan and Sumner Redstone

45. Carrington told Logan in detail about Grey raping him, however, Logan didn't care and told Carrington, he should be glad Brad Grey chose him. Redstone told Carrington he wasn't "loyal" by continuing to complain about rape. Redstone said if Carrington didn't start playing along, he would blacklist Carrington.

/ / /

### January 30, 2011, Screen Actors Guild Awards

46. Grey introduced Carrington to Harvey Weinstein on January 30, 2011, at the Screen Actors Guild Awards. Grey told Weinstein that Carrington was a new addition to the Paramount family. Grey said Weinstein could be a massive asset to Carrington's career, given he helped Grey commence his own career. Grey suggested they all work together on Carrington's dark comedy "Inheritance."

47. February 7, 2011, Audi and Weinstein party at Chateau Marmot. On February 7, 2011, Carrington attended a party at Chateau Marmot hosted by

Audi and Weinstein. Harvey Weinstein asked Carrington to meet him in a private section. Weinstein pinned Carrington in a corner with Carrington's friends nearby. Weinstein told Carrington: "I want what Brad raves about." Weinstein called Carrington a "Lenny Kravitz look-alike" and said he would "have my way with" Carrington later that evening. Carrington avoided further contact with Weinstein that evening and left before any unwanted approaches.

### February 14, 2011, Sumner Redstone

48. Redstone demanded Carrington meet him outside his Beverly Park Estate and ride with him to an invite, however they met on Sunset Blvd. Redstone told Carrington to wear business casual clothing as they were attending an event. Redstone's driver opened the backdoor for Carrington to sit with Redstone. Redstone's face was bleeding on one side, which he kept wiping. Redstone's finger was cut with a band-aid halfway on. Redstone forced Carrington to apply a new band-aid to his cut finger while Redstone massaged his own chest with his other hand. Carrington was nervous, as he was unaware of Redstone's mental state. Redstone grabbed Carrington and told him to relax.

49. Redstone's driver started to drive faster. Carrington was told to continue seeing Grey, as Grey was in love with him. Carrington complained about Grey raping him the month prior. Redstone told Carrington to shut up. Redstone said Grey and Harvey Weinstein were going to produce his dark comedy "Inheritance," and he should thank him. Carrington thanked Redstone, but

Redstone wanted an "oral thank you." Redstone kissed Carrington's lips and demanded Carrington kiss his penis. Carrington could not exit the situation, as the car was in motion. Once Carrington kissed Redstone's penis, Redstone told Carrington, "You're welcome." Redstone's driver pulled over and released Carrington from the car.

### February 25, 2011, Tom Ford Grand Opening Rodeo Drive

50. Grey instructed Carrington to meet a "business connection" at the Luxe hotel next door to discuss "Inheritance." Harvey Weinstein appeared at the bar with a room key. Weinstein demanded they go upstairs to discuss the show, as he gripped Carrington's shoulder with his hand, while rubbing his erect penis into Carrington's back. Carrington refused to do anything with Weinstein. Weinstein screamed, "Get your ass up." Weinstein pulled Carrington from his chair, while his manager was present. Weinstein said Redstone and Grey would hear about his refusal. Weinstein called Carrington a "Stupid fucking bitch who's going to be sorry." Grey scolded Carrington in front of his fiancé Cassandra for declining Weinstein.

### February 27, 2011, Vanity Fair party

51. Carrington and his friends encountered Sumner Redstone and his grandson. Redstone expressed Carrington's sexual declines to Grey and Weinstein were keeping him from succeeding. Redstone threatened to have Carrington psychically harmed by a "fixer" if he continued discussing being assaulted by

himself and Grey. Redstone said he and others could touch Carrington whenever the fuck they wanted. Redstone proceeded to spit in Carrington's face and threatened to blacklist and sue him if he didn't "alter his thinking."

### February 2011 Tony DiSanto

52. Tony DiSanto, MTV's President of Programming after Brian Graden's exit, offered Carrington a recurring role on a new series set to film in Atlanta entitled "Teen Wolf." DiSanto Executive Produced the series and attempted to purchase Carrington's silence after DiSanto came onto him. DiSanto expressed his friendship with Brian Graden and how they shared young men in the past, but DiSanto stopped engaging after becoming a family man. DiSanto said, he wishes he could have shared Carrington with Graden or now if possible. DiSanto apologized for his behavior and began making phone calls to the head casting director to arrange further movement for Teen Wolf, but Carrington refused the role to remain in Los Angeles for his reality show and dark comedy.

### March 2011 Shari Redstone

53. Carrington spoke with Shari Redstone to discuss her father, Sumner Redstone, Brad Grey and Harvey Weinstein sexually assaulting him. Shari Redstone promised Carrington the sexual assaults would end and thanked him for telling her. However, they did not end.

### April 2011 Brad Grey and Sumner Redstone

54. Carrington met with Grey and Redstone at Grey's Holmby Hills estate in the late morning, just days before Grey's wedding to Cassandra. During the meeting, Redstone and Grey told Carrington that a "business meeting" had been set up at the Peninsula Hotel in the afternoon with Harvey Weinstein, who was in town for his movie premiere, "Hoodwinked Too!" saying, "Harvey agreed to sign onto 'Inheritance' as an executive producer." Redstone said: "If you want to be taken seriously as a screenwriter, having Grey and Weinstein attached would solidify your career." They told him that Harvey would have an actress there that he was thinking of casting in the production, so the meeting would be strictly professional. They told Carrington not to leave the meeting until Weinstein had officially signed on.

55. Grey then served Carrington a spiked cocktail and insisted that he drink before sex with them. Grey said their threesome with Redstone would be "your wedding gift to me and Cassandra." Carrington refused. Grey struck Carrington in the chest, knocking the wind out of him. Redstone reminded Carrington that he would have his "fixers" beat him to a pulp if he did not behave. Redstone then demanded that Carrington strip, while both men removed their clothing. Once they were nude, Redstone sat in a chair and required Carrington sit on his lap. Redstone placed his tongue down Carrington's throat while rubbing Carrington's body in order to gain an erection. Once Redstone was erect, Grey rubbed lube onto Redstone's penis.

Redstone asked Grey to choke Carrington's neck while Redstone inserted his unprotected penis into Carrington's anus. Redstone directed Grey to masturbate while he watched him rape Carrington. Redstone asked Carrington, "Do you love being raped?" continuing: "Rape is just sex;" "You love sex;" "You love rape;" "It's all the same." After several minutes of Redstone forcing Carrington to ride his penis while facing him, Grey repositioned Carrington's body to face the opposite direction while Redstone's penis remained inside Carrington's anus. Grey French kissed Carrington before forcing Carrington's head to perform oral sex on Grey. Grey became more aggressive, insisting Redstone "cum inside his ass before I shove my dick in there." Redstone proceeded to climax inside of Carrington's anus while Carrington performed oral sex on Grey. Grey pulled Carrington's bottom off Redstone's penis before placing his penis inside of Carrington anus while standing up. Redstone sat back in the chair, holding Carrington's legs up while Grey positioned himself in and out of Carrington's anus. Grey began French kissing Carrington while raping him. Redstone cheered Grey on until Grey climaxed inside of Carrington's anus and then moved into Carrington's mouth to finish. Grey said: "Swallow my cum, so you remember who owns you." Redstone commented calmly: "Loyalty." Once they allowed Carrington to leave, they told him to go to the Peninsula Hotel and wait at the hotel bar until Weinstein arrived.

### April 2011 Peninsula Hotel, Harvey Weinstein

56. Shortly thereafter, Weinstein's female assistant took Carrington to a suite upstairs. Carrington had his manager come up with them and stand outside the room. Weinstein welcomed Carrington into the room where an unknown actress lounged. Within minutes of standing in the living room, Weinstein offered Carrington a drink as the actress pulled out cocaine. Weinstein instantly removed his pants, despite Carrington saying the meeting was not supposed to be inappropriate. Weinstein demanded the actress and Carrington snort lines from his erect penis before sucking it. Weinstein jerked his penis in between lines being snorted from his penis by the actress. Weinstein yelled, "Suck it." Carrington refused. Weinstein became angry, pulling Carrington down by his long hair, forcing Carrington onto his knees. Weinstein held Carrington's hair in his hand while pushing Carrington's mouth into his cocaine-covered penis, which displayed blood. Weinstein repeated "Do as you're told, you know the rules." Weinstein pointed to contracts and said we'd discuss business after he came. Weinstein released Carrington's hair from his hand after several minutes of forced oral sex. Weinstein and the actress disappeared into the bathroom. Carrington became lightheaded and sick due to the cocaine. Carrington entered the next room to lie on the bed in the fetal position, which helped decrease the pain. Carrington hoped Weinstein would have sympathy for his pain and focus on business, as he was not to leave until Weinstein signed onto "Inheritance."

57. Weinstein emerged from the bathroom bare; he aggressively turned Carrington onto his back with his knees pointed up. Weinstein got on top of Carrington with an erect penis and lied in between his legs with his penis rubbing against Carrington's anus. Weinstein kissed and licked Carrington's face and lips. Weinstein lifted himself, as he held Carrington down with one hand. The actress assisted Weinstein in removing Carrington's drivers and pants. Carrington couldn't remove Weinstein's heavy hand to prevent his actions, so he shouted for them to stop. The actress removed Carrington's briefs to his ankles. Weinstein lay back in between Carrington's legs as his knees were pointed up. Carrington tried pushing Weinstein off, but his weight overpowered him. Carrington begged Weinstein to stop multiple times. Weinstein said, "After I cum, boy." Weinstein ripped Carrington's briefs from his ankles and began licking his fingers as he repeatedly placed them inside Carrington's anus.

58. Weinstein spat on his unprotected erect penis before impelling Carrington's anus. Carrington screamed through the pain while trying to wiggle from under him, as Weinstein ripped tissue while going in and out. Weinstein became more aggressive and livider with Carrington, wishing he'd enjoy the rape. Weinstein kept telling Carrington how good he felt. Weinstein finally ejaculated inside Carrington, which weakened him and allowed Carrington to wriggle away. Carrington grabbed his clothes and ran out of the hotel despite Weinstein

saying he'd ruin his career. Weinstein followed Carrington while bare, screaming, "You're fucked." "I'm an important man." Carrington complained to Brad Grey and Sumner Redstone, but they didn't help. Carrington complained to Reno Logan, but he told Carrington to remain silent yet again.

### May 5, 2011, Beverly Wilshire Hotel Grey, and Tom Cruise

59. Newly married Grey introduced Carrington to Tom Cruise and his family. Cassandra Grey was intoxicated while speaking to Carrington about her husband's love affair with Carrington. Tom Cruise inserted himself into the conversation and asked Carrington for a threesome with Grey later that evening. Cruise said, "I heard how tight and warm your ass is." Cruise pulled Grey closer and whispered to Carrington, "I want to fuck you with both our dicks inside you at the same time." Grey offered to host the threesome that evening as a gift to Tom Cruise for his special day, but Carrington managed to bow out that evening.

### June 8, 2011, Regency Village Theater "Super 8" premiere

60. Grey pushed Carrington against the bathroom wall, kissing his face and lips while begging him to be his boyfriend. Grey offered Carrington trips around the world on the jet and shopping after visiting countless museums, but Carrington declined and relayed, he wasn't interested and only wanted his shows produced. Grey became angry, mentioning their shared gatherings with several known actors, producers, and directors, but Carrington declined him

again. Grey grabbed Carrington's penis, licked his face, and stated, "You'll never work again." "You don't listen." "I have you by the balls." Grey pushed Carrington to the floor in front of Carrington's manager and the Vice Chairman of Paramount, Rob Moore.

### July and August 2011

61. During July and August 2011 Grey and Redstone appeared separately a few times at Carrington's condominium in the Hollywood Hills, demanding that Carrington sign a Non-Disclosure Agreement ("NDA") and delete the emails and text regarding their sexual abuse. Carrington declined each time.

### October 3, 2011 "Footloose" Premiere at Regency Village Theater

62. Carrington and friends encountered Redstone and Grey at the Premiere of "Footloose" at the Regency Village Theater on October 3, 2011. In the presence of Grey and Carrington's friends, Redstone offered Carrington $30 Million as a settlement for the "rape," but told Carrington he could not pursue a career in entertainment if he were to accept. Carrington declined, causing contention between himself, Redstone, and Grey. Redstone threatened to sue Carrington, as he was still under contract. Grey threatened to ruin Carrington's life with the assistance of the "fixers" on payroll at Paramount. Redstone chimed in, "You're not fully white," "No one will believe you," and in a long-drawn-out comment: "Black... listed." Carrington soon discovered that his career had been blacklisted from all National Amusements, Inc. owned

companies as well as other major studios.

## June - July 2014 HBO

63. In June and July of 2014, Michael Lombardo, the President of Programming at HBO, fell in love with Carrington's dark comedy "Inheritance." Lombardo told Carrington he loved his writing and storytelling style and wanted to make an offer to sign the series. After two months of promises, Lombardo told Carrington that he would not move forward with the offer because of Sumner Redstone and Brad Grey, who used their power to prevent the deal. Grey held major influence at HBO, Executive Producing such shows as "The Sopranos" and "Real Time with Bill Maher" for HBO.

## August 2014 - Brian Graden

64. Brian Graden reemerged into Carrington's life after reaching out to apologize for sexually abusing him while he was a minor. Graden pleaded for Carrington's forgiveness and promised to Executive Produce Carrington's reality show "The Life of a Trendsetter," if Carrington were to depart his current working relationship with two prominent Producers and his affluent and well-known cast. Carrington expressed Sumner Redstone and Brad Grey held him on the National Amusements, Inc. blacklist and ruined his working relationship with HBO, by which Graden promised to help remove Carrington from Redstone's blacklist. Graden persuaded Carrington to allow him full control of his career and become his "additional boyfriend," as Photographer

Ted Sun was the first. Graden explained that Ted Sun arranged and filmed their sex parties at Graden's Hollywood Hills home, but Graden didn't have an emotional connection with Sun, which he said he desired with Carrington.

65. Graden found Carrington to be intelligent, fashionable, and compassionate, which caused Graden to fall in love. Graden and Carrington entered a two-year personal and business relationship, ending in the summer of 2016 after Carrington realized Graden stole his reality show concept "Finding Prince Charming" and sold it to Logo Network.

### October 1, 2014, Brian Graden's Hollywood Hills home

66. Graden insisted he and Carrington discuss business by the pool with cocktails. Graden announced an offer he received to be the President of Programming for the Discovery Channel. Graden expressed his excitement for the offer and for Carrington's new reality show with Lawrence Fishburne's daughter, Montana Fishburne.

67. Graden suggested they continue talking inside the pool. Carrington entered the pool with swimwear, Graden followed bare. Carrington expressed his reality show ideas with Graden until two older bare men exited the guesthouse. Carrington inquired who the men were, but Graden exited the pool to prepare new cocktails. Graden returned and insisted Carrington drink the cocktail before they entered the guesthouse alone. Unbeknownst to Carrington, the cocktail was laced with drugs, causing Carrington to feel highly sexual and

lightheaded. Carrington became numb while on the bed with Graden. Graden expressed his love for Carrington as he removed his swimwear. Graden conducted multiple sex acts before entering Carrington's rectum unprotected. Graden ejaculated inside of Carrington's rectum without permission. Graden allowed the bare men to enter the guesthouse with a camera. Carrington was impaired due to the laced drink but was able to beg the men to stop. Both men ignored Carrington's request and took turns inside his rectum unprotected, despite his continuous protests. Graden filmed the encounter while both men "double penetrated" Carrington's rectum at once (one from behind the victim and one from below), an extremely painful experience. Graden demanded that if Carrington wishes for him to continue with his offer to produce his dark comedy and reality show, Carrington should accept all his fantasies. Both men then ejaculated inside of Carrington. Graden told Carrington "Loved every time, but this was the best."

### April 22, 2015, Contract signing with Graden

68. Late in the afternoon of April 22, 2015, Carrington met with Graden alone at the Mondrian Hotel in West Hollywood. At this meeting, Graden started out with cocktails which had been prepared prior to Carrington's arrival, assuredly with GHB. After a drink, Graden presented two contracts to Carrington, explained to Carrington what they (presumably) meant. Carrington did not fully read them. He told Carrington that one was with Brian Graden Media to

produce Carrington's reality show and his dark comedy, and the other was a Non-Disclosure Agreement ("NDA") which Graden required before he would sign the production contract. He explained that as a condition, the production contract required full control of Carrington's career and his email passwords. The NDA covered Graden's underage sex with Carrington and all other sexual contacts with Viacom CBS personnel. The contracts were fully executed, and Carrington gave Graden his password.

69. Graden immediately went into Carrington's cell phone and deleted all emails implicating Sumner Redstone, Brad Grey, and Harvey Weinstein, as they required to remove him from the Blacklist. Thereafter, Graden plied Carrington with another cocktail and said: "Leave me with something to remember, since you're going to Palm Beach tonight," followed by his usual sexual abuse. Upon leaving the meeting, Carrington did not receive copies of the contracts. In fact, he never received copies.

## June 6, 2015, Brian Graden's house

70. Graden prepared cocktails while demanding that Carrington's publicists build his image for Carrington to star in "Finding Prince Charming." The business discussion turned into sex. During sex, Carrington felt his heartbeat and body temperature increasing. Carrington expressed he felt he was dying and wanted to call an ambulance. Carrington exited the bed, searching for his iPhone. Graden took Carrington's iPhone, refusing his call for help.

71. Graden placed Carrington inside the shower, as he stood inside with him. Carrington lay on the floor with hard pressure water constantly covering him. Graden began having sex with Carrington, but Carrington could not endure the intercourse. Graden became aggressive, telling Carrington to leave, as he didn't want him to "die in his home." Graden begged Carrington not to see a doctor if he wanted Graden to proceed with producing his finding love reality show. Graden said the following to Carrington that night:

> "I drugged you to increase the sex."
> "Papi wanted his Prince to take his dick all night."
> "Please don't call 911. I can get into trouble if you say I drugged you."
> "I have shows airing right now. You won't get a show if you tell."
> "Don't ruin daddy. You love Daddy right?"
> "You're Daddy's good nigga right?"
> "I love you my Prince."
> Once the drugging wore off, Graden said, "Glad you feel better."

///

## June 2015 Brian Graden's house

72. Graden held a party at his home, which Carrington arrived at with three friends. The party was advertised as an entertainment party, but Carrington discovered it was a sex gathering with underage boys and several Executives under Viacom CBS. After seeing Graden and several underage boys, Carrington attempted to leave. However, Graden became argumentative and abusive. Graden slapped and choked Carrington in front of his friends. Graden told Carrington if he shared witnessing Graden and several know figures

performing sex acts with the boys, Graden wouldn't produce his shows, despite the recently signed contracts. Carrington was told, "He'd be blacklisted again, and Sumner Redstone would make it permanent this time."

### June 2016 Brian Graden's house

73. Graden apologized to Carrington for all the physical and sexual abuse he committed, as well as several men employed by Graden who inflicted indelible scars onto Carrington. Graden expressed his distaste for the Redstones, as he wished to get out of their working relationship to focus on his unrevealed music career. Graden ripped up Carrington's NDA and business contract and threw them away, freeing Carrington to sign and produce shows with other studios. Graden said he signed a new reality show with Logo Network thanks to the "new rhythm" Carrington provided him, but he couldn't go into details, other than Logo's hesitation about Graden's escort, Robert Sepulveda Jr., starring in the show. Graden said Logo's executives knew Graden and his other boyfriend, Ted Sun, participated in filmed sex with Robert, causing their fear of a scandal and lawsuit. Graden said a famous figure would also be joining the show.

74. Carrington went through Graden's iPhone and MacBook Air to get details about the show and discovered videos of his sexual assaults, from the time he was underage until recently, as well as other young men. Carrington demanded that Graden erase the videos, but he refused. The videos pictured Graden and

other executives participating in the acts of sex, including Graden's attorney, Larry Stein. Stein kissed Carrington and committed anal intercourse (penile penetration into Carrington in both the missionary position and 'doggie style,') and with other teenage boys, all while the victims were unconscious. Graden threatened to show the videos of Carrington to other Executives if he mentioned the video collection or tried writing about their relationship on his website "TheCarringtonDiaries.com" or inside one of his screenplays.

### November 6, 2016 Brad Grey

75. Brad and Cassandra Grey approached Carrington and his friend at "Dan Tana's" in West Hollywood, CA. Grey asked how Carrington's career was going after Grey had seen him on red carpets and in interviews promoting his website, "TheCarringtonDiaries.com." Grey demanded Carrington come back into his life and leave Graden if he wanted things to be easier for himself. Grey grabbed at Carrington's penis and relayed, "I miss our Jewish bodies rubbing against each other." Grey suggested Carrington join him in China for the premiere of Paramount's new film "Allied," as Cassandra wouldn't be attending. Carrington told him: "Fuck off. I haven't forgotten how you raped me and blacklisted my career." Grey relayed, "Your career won't succeed without me or Paramount fucking you. Fuck your career." "No one with a name will touch you, but you know that from experience." Grey laughed about Graden producing "Finding Prince Charming" without Carrington as the star.

Grey shared, "Brian shared videos of him fucking you," "I came while watching every video."

### November 6, 2016: The Polo Lounge

76. Carrington had dinner with friends after his encounter with Brad Grey. Grey's close friend, Bob Saget, arrived with John Mayer and another gentleman and sat right next to Carrington's booth. Saget made derogatory remarks to Carrington, causing Carrington to excuse himself from the table. Saget then followed Carrington into the restroom, calling him a "whore" and "cocksucker," saying, "You like sucking cock, right? Suck mine. I know you do it well." He cornered Carrington, pushing him onto the sink, and said, "Treat me like Brad." When someone entered the restroom, Saget left. Carrington returned to his table and had to tolerate Saget continuing derogatory comments until John Mayer told him to stop.

### June 2016: Graden Steals Carrington Shows

77. In June 2016, Graden signed "Finding Prince Charming," whereby Logo Network agreed to premiere the show on their network, with Graden as the creator and Executive Producer. Graden stole the show from Carrington. Promotion for the show came out in July 2016. Finally, after a year of not talking to Graden, in August 2017, Carrington confronted Graden for stealing "Finding Prince Charming." Graden admitted that he stole it and gave the starring role to his escort, Robert Sepúlveda, Jr. Graden's attorney, Larry Stein

assisted Graden in concealing his admission, in exchange for Graden's offer to Executive Produce Carrington's new dark comedy "Heiristocracy." Graden allowed Carrington creative control and gave him permission to include other known Producers, like Darren Stein, who saw it as an opportunity to work with Graden.

78. In September 2017 Graden read "Heiristocracy's" pilot and discovered Carrington had detailed his underage relationship with Graden, in addition to the sexual abuse Carrington suffered from Brad Grey, Harvey Weinstein and Sumner Redstone. Graden punched Carrington in the face multiple times and threatened to blacklist the show and compelled Darren Stein to decline his Producer offer.

79. In October 2017 Darren Stein removed himself from "Heiristocracy" via email, after Brian Graden's influence. Within two minutes, Stein sent a follow-up email with the exact context minus Brian Graden's name. Stein had initially agreed to be attached to "Heiristocracy"

### November 2017 Variety

80. Carrington's publicist reached out to Executive Editor Debra Birnbaum regarding Brian Graden's toxic and inappropriate relationship with Carrington. Birnbaum and Carrington discussed Graden drugging, raping and physically abusing Carrington over a 10-year span. Birnbaum learned Graden used physical force and blacklisting threats to keep Carrington silent about it.

Birnbaum spoke with eight witnesses and gathered evidence from Carrington, confirming the abuse of Carrington. Birnbaum stated that Carrington was "Stupid to stay in a relationship with Brian." Birnbaum confirmed the story was printing and she would reach out to Graden for comment.

81. Birnbaum called Carrington and his publicist, revealing that Gene Maddaus had taken over the story and sold the evidence to Larry Stein and Brian Graden, as Stein is close friends with Maddaus.

82. After multiple reporters learned of Graden's proclivity for pedophilia, Carrington and his publicist received death threats from Larry Stein and Brian Graden. When Graden lied to reporters about his relationship with Carrington, one reporter confronted him with evidence: photos, texts, and emails.

/ / /

/ / /

## VI.   **Protections Afforded by the Americans with Disabilities Act (ADA) and subsequent Amendments Act (ADAAA) Title II of the ADAAA, explain that anyone:**

83. "[W]ho, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity" must, as a matter of law, be

provided with those services.    42 U.S.C. § 12131(2).    Case law further evidence that:

84. "To prevail on a claim for violation of Title II of the ADA, the Plaintiff must show (1) that she is a qualified individual with a disability; (2) that she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits or discrimination was by reason of the Plaintiff's disability." *Douris v. Dougherty*, 192 F. Supp. 2d 358, 368 (E.D. Pa. 2002).

85. Plaintiff Carrington has met all of the above requirements, establishing a prima facie case under the Americans with Disabilities Act, and subsequent Amendments ("ADA"). When Plaintiff Carrington was called to answer the perjury charge, initiated by Judge Valerie Caproni, he submitted his personal medical information under seal. These documents established that he is a person with a disability. Plaintiff submitted such, with a request to be permitted to appear by zoom in New York, from California, due to the Covid-19 pandemic, and its growing cases. He was denied this benefit, and ultimately punished for such actions. The sum of these actions has resulted in a deprivation of Plaintiff Carrington's liberty, as he ended up pleading guilty under duress, described in detail below.

86. As mandated by *L.C. v. Olmstead*, 138 F.3d 1485 (11th Cir. 1998):

[T]he states' need to maintain a range of facilities for the care and treatment of individuals with diverse mental disabilities must be recognized. In determining whether a state can successfully assert a "fundamental alteration" defense (i.e., claim that providing community-based services to an individual would fundamentally alter the state's service-delivery system), courts must consider not only the cost of providing community-based care to the litigants, but also the state's obligation to mete out services to others with mental disabilities in an equitable manner.

87. Although Plaintiff Carrington did not directly make a request for accommodations, that was the plain meaning of his actions when asking to appear remotely for a hearing regarding the perjury charge. Under the ADA, a formal request to the court was not required, as there are no magic words to making a reasonable request. As each courthouse has an ADA coordinator, it was the duty of the judge to recognize an ADA request was being made, and to contact the court administration.

88. In University of *Alabama v. Garrett*, 531 U.S. 356, 363 (2001), the Supreme Court reaffirmed that Section 5 of the Fourteenth Amendment grants Congress the power to abrogate the States' Eleventh Amendment immunity to private damage suits. California followed the same in *Dare v. California*, 191 F.3d 1167 (1999), cert. denied, 121 S. Ct. 1187 (2001). Title II governs all the operations of a State, which plainly encompasses state conduct subject to a number of other constitutional limitations embodied in the First, Fourth, Fifth, Sixth, Seventh, and Eighth Amendments and incorporated and applied to the States through the Fourteenth Amendment. Those rights include the right to

vote, to access the courts, to petition officials for redress of grievances, to receive due process from law enforcement officials, and to be confined where conditions are humane. To the extent that Title II enforces the Fourteenth Amendment by remedying and preventing government conduct that burdens these constitutional provisions and discriminates against persons with disabilities in their exercise of these rights, Congress did not need to identify irrational government action in order to identify and address unconstitutional government action. See *Popovich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 813-814 (6th Cir. 2002) (en banc); id. at 820 (Moore, J., concurring) ("The fact that Title II implicates constitutional violations in areas ranging from education to voting also suggests that heightened judicial scrutiny under both the Due Process and Equal Protection Clauses is appropriate.")

89. Title II requires "reasonable modifications" in public services. 42 U.S.C. 12131(2). That requirement, however, is carefully tailored to the unique features of disability discrimination that Congress found persisted in public services in two ways. First, given the history of segregation and isolation and the resulting entrenched stereotypes, fear, prejudices, and ignorance about persons with disabilities, Congress reasonably determined that a simple ban on discrimination would be insufficient to erase the stain of discrimination. Cf. *Green v. County Sch. Bd.*, 391 U.S. 430, 437-438 (1968) (after

unconstitutional segregation, government is "charged with the affirmative duty to take whatever steps might be necessary" to eliminate discrimination "root and branch"). Therefore, Title II affirmatively promotes the integration of individuals with disabilities – both in order to remedy past unconstitutional conduct and to prevent future discrimination.

90. Since the inception of the ADA, there have been several advancements that have made litigation more accessible for disabled litigants, such as Plaintiff Carrington.   One such case showed that the standard used to be strictly a physical one to access the courts, now is thought to also obligate all public entities, including court systems, to facilitate equal participatory and testimonial access.   *See In re: Ruby McDonough*, 457 Mass. 512. (2010). Although this case is not binding in California, it is persuasive and through *Dare v. California*, 191 F.3d 1167 (1999), cert. denied, 121 S. Ct. 1187 (2001), California is following the spirit of the ADA and further developments.

91. Plaintiff Carrington was denied a request for an accommodation to appear remotely during the height of the Covid-19 outbreak, which was denied by Judge Caproni, a colleague of Judge Failla. As Judge Caproni made the ruling to deny Carrington's reasonable accommodation to have access to this public system, she effectively waived her eleventh immunity, giving rise to this suit. Plaintiff Carrington is merely attempting to rectify the discrimination and violations of his various rights as he has described herein. The ADA provides

a clear path to remedy such injustice and creates an even playing field for all litigants to have participatory access to the courts.

## VII.   NEGLIGENT DISREGARD FOR A SUBPOENA DURING AN ACTIVE COURT CASE

92. During the NY Case (Exhibit One), both Google and GoDaddy had information regarding the Plaintiff in that case. Under the direction of the court, that confidential information was only supposed to be supplied to the FTI for review, by Google and Godaddy. However, both entities provided the information to Paramount Pictures and Viacom's (Paramount Global) attorneys.  As a result, the Plaintiff suffered, irreparable damages by the release of the information, which was later used against the Plaintiff in the NY Case, in Variety and The Hollywood Reporter and by the federal prosecutor over the perjury case, who used the exact same data and false claims made by Paramount Global and Paramount Pictures' attorney Larry Stein, in order to indict Carrington with criminal charges. Due to the nature of the subpoena regarding said information, Google and GoDaddy both owed a duty to the Plaintiff to only release it to the FTI.  They breached that duty, and were the de facto and only cause of the breach which led to the Plaintiff's damages.

## VIII.  DEFAMATION PER SE BY THE USE OF THE ILLEGALLY RELEASED INFORMATION AS WELL AS PUBLIC SLURS AIMED AT THE PLAINTIFF'S CHARACTER

93. Having full knowledge of how the damaging statements were received, National Amusements, Inc., Paramount Pictures, Paramount Global, Variety, and the Hollywood Reporter willingly published information about false sexual abuse claims, false evidence claims, Carrington's raw data, Carrington's unjustified arrest, and other damaging information on the Plaintiff with the sole purpose of destroying Carrington.   The publication of this information has caused massive amounts of mental distress, as well as damage to his professional reputation! Furthermore, representatives for the Defendants, as seen below, called the Plaintiff a "Nigger." (California case, Complaint pg. 8, ¶10) The use of this word in such a derogatory manner not only dehumanizes the Plaintiff but is Defamation per se by likening Plaintiff to someone who is less than other human beings.

### **Graden Lawyer Stein: "Niggers never win in a courtroom"**

94. Rovier Carrington's abusers certainly appear to be racially motivated, at least to some degree. For example, after a hearing in the California TRO matter, Defendant Brian Graden's attorney Larry Stein confronted Carrington outside the courthouse in the presence of witnesses, called him a "stupid fucking Nigger" and told him, "Niggers never win in a courtroom." While Judge Failla herself has not issued any statements that overtly indicate racial animus towards Carrington, insofar as Judge Failla disregarded the entire Federal Rules of Civil

Procedure in denying all procedure to Carrington, further inquiry into Judge

Failla's motivations – racial or otherwise - seems entirely appropriate.

### IX.   Defense to Formation of a Contract with the Government through a Plea in a Criminal Proceeding

95. The first attempt to regulate plea bargaining came in 1946, when Congress

promulgated Federal Rule of Criminal Procedure 11. At the time, Rule 11

simply stated that a judge should not accept a guilty plea "without first

determining that the plea is made voluntarily with understanding of the nature

of the charge." In 1966, the Supreme Court amended Rule 11 to prohibit a judge

from accepting a guilty plea "without first addressing the defendant personally

and determining the plea is made voluntarily with understanding of the nature

of the charge and the consequences of the plea." FED. R. CRIM. P. 11 (1946)

(amended 1966). Despite the Supreme Court's amendment to Rule 11, the Court

itself noted that it was not until its 1971 opinion in *Santobello v. New York*, 404

U.S. 257 (1971), "that lingering doubts about the legitimacy of the practice

were finally dispelled.

96. The 1987 Supreme Court case *Ricketts v. Adamson*, 483 U.S. 1, 107 S. Ct.

2680 (1987) highlighted the fact that there have never been rules of

construction created for plea agreements, but it did not define the extent to

which commercial contract law informs plea-bargaining law. Nonetheless,

subsequent precedent, including Supreme Court precedent, makes clear that

defendants entering into plea agreements should be treated at least as well as parties entering into commercial contracts. It also established that the terms of such agreements may be breached by a party. *Id.* at 5-6.

97. In a dissenting opinion joined by Justices Marshall, Blackmun, and Stevens, Justice Brennan began by noting that the entire case hinged on whether Adamson breached the plea agreement.

98. He then used the following language:

> This Court has yet to address in any comprehensive way the rules of construction appropriate for disputes involving plea agreements. Nevertheless, it seems clear that the law of commercial contract may in some cases prove useful as an analogy or point of departure in construing a plea agreement, or in framing the terms of the debate. It is also clear, however, that commercial contract law can do no more than this, because plea agreements are constitutional contracts. The values that underlie commercial contract law, and that govern the relations between economic actors, are not coextensive with those that underlie the Due Process Clause, and that govern relations between criminal defendants and the State. Unlike some commercial contracts, plea agreements must be construed in light of the rights and obligations created by the Constitution.

99. Justice Brennan determined that the majority's opinion finding Adamson in breach was especially problematic because, "far from being a commercial actor, Adamson is an individual whose 'contractual' relation with the State is governed by the Constitution."   Therefore, "[t]he determination of Adamson's rights and responsibilities under the plea agreement is controlled by the principles of fundamental fairness

imposed by the Due Process Clause." As a result, granting "one party—here, the State—the unilateral and exclusive right to define the meaning of a plea agreement is patently unfair." *Id.* at 21.

100. Plaintiff Carrington pled guilty to a change of perjury while under duress, as he only received such charge after attempting to exercise his First Amendment Right to Redress the Government for Grievances, which mirrors the concepts raised in *Ricketts* above. He withdrew the California Suit after his life was threatened by Judge Failla and her co-defendants. Carrington was afraid for his life due to the Covid-19 pandemic. He was put in this position for speaking his truth and facing his sexual abusers: Brad Grey, Brian Graden, Sumner Redstone, Harvey Weinstein and Larry Stein, his former employers and counsel, who were named employees and an owner of the above captioned Defendants and/or the above captioned Defendants themselves. It was these actions of these parties cumulatively between the initial abuse, and the later fraud surrounding the investigation with FTI to cover up such abuse, that resulted in Plaintiff Carrington's Constitutional violations and his guilty plea being entered into under duress.

101. The *Ricketts* dissent continued to explain that under this theory of plea agreements as constitutional contracts, the Due Process Clause requires that pleading defendants be treated at least as well as parties to

other contracts, and specifically government contracts. At a minimum, this means that every contract defense and rule of construction that applies in the civil contract law context should apply to the extent that it would assist pleading criminal defendants. Again, in the abstract, this proposal should not be too controversial, given that courts across the country have found that plea agreements are governed or strongly influenced by contract law, with defendants also afforded the additional protection of the Due Process Clause. *Id.* at text accompanying notes 57 - 58.

102. In *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163 (N.Y. 1933), it was established that, "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. *Id.* at 168. Moreover, section 205 of the Second Restatement of Contracts, which applies to non-Uniform Commercial Code contracts for goods, provides that, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Both the Court of Federal Claims, which hears disputes over government contracts, and the United States Court of Appeals for the Federal Circuit, which

reviews those decisions on appeal, have found that the implied covenant of good faith and fair dealing applies to all government contracts. *See Nat'l Austl. Bank v. United States*, 452 F.3d 1321, 1324 (Fed. Cir. 2006).

103. Clearly, Plaintiff Carrington was not offered such good faith and fair dealing required at the formation of the contract in question: the plea. In fact, he felt that he had no choice, as there was unequal bargaining power. Judge Failla had decided to pursue such a charge after she was named as a Defendant in the California Suit. She ordered that if the California Case was not dismissed with prejudice by February 22, 2021, Carrington would be jailed on contempt and his counsel would be fined $500 per day until dismissed. (Attached as Exhitit 2 is a true and correct copy of an Order issued February 9, 2021 by Judge Failla detailing Carrington's surrender to US Marshals on February 22, 2021.) Carrington's health made imprisonment a death threat due to Covid-19. Under such duress, Carrington instructed his counsel to dismiss the California Case with prejudice, which he did on February 17, 2021, and reported the dismissal to Judge Failla. (Attached as Exhitit 3 is a true and correct copy of an email from Carrington to the California Case judge on February 17, 2021 explaining his reasons for the dismissal.)

104. On or about September 30, 2022, the federal prosecutor over the perjury case against Carrington approached him while alone and revealed that he had been assigned the case as he had been in an intimate relationship with Graden. He informed Carrington that due to the collegiate relationship between Judges Failla and Caproni, none of Carrington's evidence of innocence would ever be admitted in the criminal trial. At that time, he offered Carrington a plea bargain of 15 months incarceration in exchange for a guilty plea, rather than five years prison time if he took the case to trial. Carrington's defense counsel later advised him to take the plea because she knew that all his exculpatory evidence would be suppressed due to the harm it would cause to Judge Failla. Carrington therefore read a false statement of admission, as directed by the prosecutor, to the court and plead guilty.

## X.   Injuries

105.  Cumulatively Plaintiff Carrington suffered a succession of events, to which deprived him of Constitutional rights, protections as a qualifying litigant under the ADA, and moreover placed him in duress while entering a plea for the resulting false perjury charge. He was denied the Right to Redress his government and bring his grievances against his sexual abusers. Plaintiff Carrington faced public ridicule, slander, and liable in the media and at the hands of the above-captioned Defendants. Most importantly, on July

10, 2023, Plaintiff Carrington will be sentenced for said plea, and be deprived of his liberty for merely exercising his rights against his sexual abusers while a neutral investigative third-party approved in the New York Suit cleared him of any wrongdoing.

**XI.    Relief**

106.  Plaintiff Carrington prays this Honorable Court grant his petition, and award him the following relief:

1.  An award of $250 Million as to National Amusements, Inc.;

2.  An award of $250 Million as to Paramount Studios;

3.  An award of $250 Million as to Paramount Global;

4.  An award of $150 Million as to Google;

5.  $150 Million as to GoDaddy;

6.  $100 Million as to Variety;

7.  $100 Million as to The Hollywood Reporter;

8.  Declaratory judgment rendering the New York Suit Protective Order null and void.

        Respectfully submitted,

DATED:  July 6, 2023

G. Scott Sobel
Attorney for Rovier Carrington

VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES - 55

## Certification

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discover; and (4) the complaint otherwise complies with the requirements of Rule 11.

DATED: July 6, 2023

Rovier Carrington

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**

**EXHIBIT 1**



Kevin Aaron

Share your name and photo?
Rovier Carrington

Jun 19, 2018 at 1:32 PM

Hey buddy- did you see the amended complaint we filed late last night?

We are working the PE route. HR may be interested in doing a more in-depth piece.

Deadline issued an "update" to misdated they are reviewing.

You took down your website right???!

Hey Kevin,

I haven't received the compliment, as of yet, but I was just told it's on the way.

Lovely HR!

I must review deadline.

My website is up, but the content was removed.

They may not run it though. They're taking time to review under the

iMessage

5p 1

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

**EXHIBIT 2**

# U.S. District Court

## Southern District of New York

### Notice of Electronic Filing

The following transaction was entered on
2/9/2021 at 8:51 AM EST and filed on 2/8/2021
**Case Name:**   Carrington v. Graden et al
**Case Number:**   1:18-cv-04609-KPF
**Filer:**
**WARNING: CASE CLOSED on 10/11/2019**
**Document Number:** 214

### Docket Text:

ORDER: Accordingly, it is hereby ORDERED that
Plaintiff Rovier Carrington, having been found of
civil contempt on February 4, 2021, by this Court,
is sanctioned to arrest and confinement until he
complies fully with the Court's September 11,
2020 and December 23, 2020 Orders. Plaintiff
shall surrender his person to the custody of the
U.S. Marshals at the below address on or before
February 22, 2021: U.S. Marshals Service for the
Central District of California, Roybal Federal
Building, 255 East Temple Street, Los Angeles,
California, 90012. On the date of Plaintiff's
surrender, he is to arrive at the above address
before 12:00 p.m., and is to inform the security
checkpoint officials of his self-surrender. If
Plaintiff does not self-surrender on or before
February 22, 2021, the U.S. Marshals shall use
reasonable force necessary to apprehend
Plaintiff, including forcible entry of any residence
or domicile believed to be associated with

Ex 2

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**

**EXHIBIT 3**



From: Rovier Carrington >
To: VAP_chambers@cacd.uscourts.gov >
Cc: Christine_Chung@cacd.uscourts.gov >
February 17, 2021 at 10:24 AM

# Carrington v Weinstein; Case 2:20-cv-09825

I, Rovier Carrington am writing this letter while under distress. I am being threatened and harassed into dismissing this lawsuit with prejudice by request of Judge Katherine Polk Failla, who is a defendant in this case. Judge Failla has held me in contempt and wishes to place me in jail on February 22, 2021 for having filed this lawsuit against her and the other defendants. Judge Failla placed an injunction against me a year after dismissing the prior case, which she resided over. The injunction was granted to prevent herself and the other defendants from facing a judgment in this courtroom regarding the fraud upon the court Judge Failla and the opposing counsel purposely and jointly committed in order to destroy my sexual abuse claims. I am innocent in the matter. There's proof the defendants committed fraud in the prior case, which Judge Failla helped cover up. I refuse to be placed in jail when I have never committed a crime. I desired justice for my sexual abuse claims against defendants, Sumner Redstone, Harvey Weinstein, Brad Grey, Brian Graden and the opposing leading defense attorney Larry Stein. I also desired justice against all opposing counsel and judge Failla for their shared fraud upon the court in the prior case.

I'm aware this letter will possibly go unseen, and I'm

Ex 3